JOHN J. JORDAN, ESQ. (State Bar No. 175678)
601 Montgomery Street, Suite 850
San Francisco, CA 94111
Tel: (415) 391-4814
Fax: (415) 391-4309
Email:jjordanesq@aol.com

Counsel for Defendant
PETER MCKEAN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | No. CR 17-0175 CRB |
|---|---|---|
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S SENTENCING** |
| vs. | ) | **MEMORANDUM** |
| | ) | |
| PETER MCKEAN, | ) | |
| | ) | Date:   July 31, 2020 |
| Defendant. | ) | Time:  10:00 a.m. |
| | ) | Hon. Charles R. Breyer |
| | ) | |
| | ) | |

McKean  Sent. Mem.

**TABLE OF AUTHORITIES**

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Factual Background of Offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1.      Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2.      Applicable Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

3.      The Defendant Should Receive an Adjustment for Acceptance of Responsibility. . . . . . 5

4.      The Defendant's Request for Ten Months Home Confinement. . . . . . . . . . . . . . . . . . 10

a.      The Impact of the COVID-19 Pandemic Favors a Non-Jail Sentence. . . . . . . . . . . . . . . 10

b.      The Relevant 18 U.S.C. § 3553(a) Factors Also Favor a Non-Jail Sentence. . . . . . . . . . 13

i.      The nature and circumstances of the offense. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ii.     The history and characteristics of the defendant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iii.    The need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

1

**TABLE OF AUTHORITIES**

2 **Cases:**

3 *Gall v. United States,* 552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

4 *United States v. Ameline*, 409 F.3d 1073 (9th Cir. 2005) (en banc). . . . . . . . . . . . . . . . . . . . . . 5

5 *United States v. Booker,* 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

6 *United States v. Burrows*, 36 F.3d 875 (9th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

7 *United States v. Cantrell,* 433 F.3d 1269 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

8 *United States v. Davis*, 36 F.3d 1424 (9th Cir. 1994), *cert. denied*, 115 S. Ct. 1147 (1995). . . . . 6

9 *United States v. Hernandez*, 894 F.3d 1104 (9th Cir. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10 *United States v. Ing*, 70 F.3d 553 (9th Cir. 1995), *cert. denied,* 517 U.S. 1112 (1996). . . . . . . 6, 7

11 *United States v. Marquardt*, 949 F.2d 283 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

12 *United States v. Mix,* 450 F.3d 375 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

13 *United States v. Mohrbacher*, 182 F.3d 1041 (9th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

14 *United States v. Molina*, 934 F.2d 1440 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

15 *United States v. Vance*, 62 F.3d 1152 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16 **Statutes and Rules**:

17 18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 18 U.S.C. § 1349. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

19 18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5, 12, 13

20 U.S.S.G. § 3E1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21 U.S.S.G. § 5K2.12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

22

23

24

25

26

JOHN J. JORDAN, ESQ. (State Bar No. 175678)
601 Montgomery Street, Suite 850
San Francisco, CA 94111
Tel:  (415) 391-4814
Fax:  (415) 391-4309
Email:jjordanesq@aol.com

Counsel for Defendant
PETER MCKEAN

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR 17-0175 CRB |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S SENTENCING** |
| vs. | ) | **MEMORANDUM** |
| | ) | |
| PETER MCKEAN, | ) | |
| | ) | Date:   July 31, 2020 |
| Defendant. | ) | Time:  10:00 a.m. |
| | ) | Hon. Charles R. Breyer |
| | ) | |
| | ) | |

**INTRODUCTION**

The defendant, Peter McKean, through counsel of record, John J. Jordan, hereby files this sentencing memorandum.  Mr. McKean, who has no prior criminal record whatsoever, appears for sentencing after being found guilty of participating in an unfortunate bid-rigging scheme.  Mr. McKean went to trial after joint plea offers to him and a co-defendant were not accepted by the co-defendant, and an individual plea was not pursued by the defendant.

McKean has reviewed the final Pre-Sentence Report and maintains Objection Number 3 (which should be labeled Objection Number "2"), to the denial of acceptance of responsibility. McKean drops Objection Number 1 as to the appropriate guideline Base Offense Level.

Mr. McKean asks the Court to grant the probation department's proposed variance, but convert the 5 months incarceration followed by 5 months home detention recommended by the probation officer to time served, with 3 years supervised release, with a condition that he serve 10 months home detention, so he can maintain employment and stay safe from COVID-19.

McKean  Sent. Mem.                                  1

**FACTUAL BACKGROUND OF OFFENSE**

This case arises from an FBI sting operation looking into bid-rigging for federal building projects in the Bay Area, where an undercover agent ("UC") claimed to have a corrupt insider relationship with "Maria" a contracting officer at Lawrence Berkeley National Laboratory ("LBNL").   PSR ¶ 16.  As the Court sat through multiple trials on this case, the defendant will not go into great detail about the facts of the offense.

In September 2013, co-defendant Butler initiated the idea of bringing in a construction manager to assist the undercover agent ("UC") with a renovation at LBNL and proposed using McKean of TMI Construction to assist the UC once he won the contract. The UC was agreeable and said he needed McKean to send in a bid of $6.2 million.  PSR 23.

On October 1, 2013, McKean met with the UC at a hotel room.  Butler joined by phone toward the end.  The UC laid out the scheme for McKean, including explaining that the contracting officer had skirted all the rules to give him this job.  The UC said that if McKean was comfortable with how the deal was arranged, they would create a business structure to "pass the money around."  PSR ¶ 24.  The UC said he needed McKean's number to be $6.2 million. McKean agreed to send off the bid to the lab the next day, as the UC requested.  PSR ¶¶ 23-24.

On October 3, 2013, McKean, on behalf of TMI, emailed a letter addressed to the DOE contracting officer submitting a lump sum bid for $6 million to perform the renovation. McKean and the UC discussed the letter, and the UC stated his approval.  Later that day, McKean met with the UC to listen in on a call from Maria, who said that the contract was going to the UC but she needed another bidder to come in over his $5.9 million.  PSR ¶ 27.

After the call, McKean said he would try to think of someone else who could submit a bid. Butler called in during the meeting, and the UC and McKean reported that another bid was going to be needed.  Two days later, Butler came up with the idea of presenting the scheme to another contractor, and the contractor sent in a bid to DOE.  PSR ¶ 27.

**PROCEDURAL BACKGROUND**

On April 6, 2017, defendant Peter McKean and three co-defendants, Clifton Burch, Derf Butler, and Anton Kalafati, were charged with one count of conspiracy to defraud the United States Department of Energy in violation of 18 U.S.C. § 371.  Clerk's Record ("CR") 1.  The indictment alleged that McKean conspired with the co-defendants and an undercover agent (UC) to submit bids at predetermined prices in order to ensure that the UC would secure a contract with the Lawrence Berkeley National Laboratory.  *Id.*

On March 9, 2018, co-defendant Kalafati pled guilty to one count of conspiracy to defraud the United States Department of Energy.  CR 109-110.

Prior to trial, McKean had entered into plea discussions with the government.  This included two proffer sessions with the government.  PSR ¶ 39.

On September 24, 2018, the government offered McKean and Burch a plea offer with a recommended non-custodial sentence if both defendants accepted the offer.  The government indicated that this was a joint offer, conditioned on co-defendant Burch entering a guilty plea.  However, as detailed in the motion for a new trial filed by Burch, Burch declined the government's offer.  Because Burch had declined the offer, McKean could not accept the offer.

In October of 2018, the government provided Burch and McKean a draft plea agreement offering diversion.  Again, however, the plea offer required both defendants to accept the deal.  As described in Burch's motion, he again declined the government's offer.  Because Burch rejected the offer, McKean was unable to accept the offer for himself, even though he wished to accept the government's offer.

On November 8, 2018, the government filed a superseding indictment charging McKean and Burch with an additional count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349.  CR 325.

Trial began on February 4, 2019.  On February 20, 2019, the jury found both defendants guilty of count one and count two of the Superseding Indictment.

McKean  Sent. Mem.                          3

1    The defendant has received and reviewed the final sentencing report (PSR) prepared by

2    the U.S. Probation Department.  The PSR calculates a final offense level of 12, criminal history I,

3    with an advisory guideline range of 10 to 15 months incarceration.

4    The probation officer submitted that "The Court may wish to consider the defendant's

5    family and business responsibilities, his community involvement, his military service, and the

6    adverse impact the conviction in the instant offense has had on his business in support of a

7    custodial sentence below the advisory guideline range, pursuant to 18 U.S.C. § 3553(a) - history

8    and characteristics of the defendant and nature and circumstances of the offense."  PSR ¶ 101.

9    **ARGUMENT**

10   **1.    Introduction**

11   Initially, McKean asks the Court to grant a 2 point adjustment for acceptance of

12   responsibility, as he went to trial on an entrapment defense, repeatedly admitted making the

13   illegal bid, and did not contest the government's version of the facts.

14   The defendant then asks this Court to impose a sentence of time served, with 3 years

15   supervised release, with a condition that he serve 10 months in home detention with electronic

16   monitoring.  The defendant also joins in the $3000 fine recommended by probation.  This would

17   allow Mr. McKean to keep working and stay safe from the COVID 19 pandemic, while still

18   punishing him.

19   **2.    Applicable Law**

20   In this post-*Booker* sentencing, a district court is "not mandated to sentence within an

21   applicable Guideline range because the Sentencing Guidelines are advisory--not mandatory."

22   *United States v. Mix,* 450 F.3d 375 (9th Cir. 2006), citing *United States v. Cantrell,* 433 F.3d

23   1269, 1279-81 (9th Cir. 2006) and *United States v. Booker,* 543 U.S. 220, 259-60 (2005).

24   District courts, however "'must consult [the] Guidelines and take them into account when

25   sentencing,' even though they now have the discretion to impose non-Guidelines sentences."

26   *United States v. Cantrell,* 433 F.3d at 1279, quoting *Booker,* 543 U.S. at 264.

McKean  Sent. Mem.                          4

1    This Court should begin the sentencing proceeding by correctly calculating the applicable

2    Sentencing Guideline range.  See *Gall v. United States,* 128 S.Ct. 586, 596, 169 L.Ed.2d 445

3    (2007) (stating that "a district court should begin all sentencing proceedings by correctly

4    calculating the applicable Guideline range.").  "In addition, a district court must apply the factors

5    enumerated in 18 U.S.C. § 3553(a) in its sentencing decision." *United States v. Mix, supra,* citing

6    *United States v. Cantrell,* 433 F.3d at 1279-80; see also *United States v. Ameline*, 409 F.3d 1073,

7    1085-86 (9th Cir. 2005) (en banc).

8    Thus, in addition to the advisory Guideline range, the district court must consider "the

9    nature and circumstances of the offense and the history and characteristics of the defendant" as

10   well as the need for the sentence to reflect the seriousness of the offense, promote respect for the

11   law, provide just punishment, afford adequate deterrence, protect the public, and provide the

12   defendant with needed training and medical care.  18 U.S.C. § 3553(a)(1)-(2).   The court must

13   also address the need to avoid unwarranted sentence disparities among defendants with similar

14   records who have been found guilty of similar conduct and the need to provide restitution to any

15   victims of the offense.  18 U.S.C. § 3553(a)(6)-(7).

16   **2.     The Defendant Should Receive an Adjustment for Acceptance of Responsibility**

17   McKean, in this unusual case, is entitled to a 2 level downward adjustment to the

18   Sentencing Guidelines Offense Level, for acceptance of responsibility.   U.S.S.G. § 3E1.1.

19   McKean's defense at trial was that he was entrapped.  By definition, only people who

20   commit illegal acts are entrapped.  If the crime is not committed, then no one was entrapped.

21   And the defense of entrapment is inherently a legal defense.  A lay person may truly believe he or

22   she was entrapped, but a jury, looking at the Ninth Circuit jury instructions, and the law on

23   inducement, may decide no, not under the law.

24   For this reason, the Ninth Circuit has recognized that a defendant interposing a trial

25   defense of entrapment may be entitled to acceptance of responsibility, stating that "It is clear that

26   a judge cannot rely upon the fact that a defendant refuses to plead guilty and insists on his right to

McKean  Sent. Mem.                                5

1    trial as the basis for denying an acceptance of responsibility adjustment." *United States v.*

2    *Mohrbacher*, 182 F.3d 1041, 1052 (9th Cir. 1999), citing *United States v. Vance*, 62 F.3d 1152,

3    1157-58 (9th Cir. 1995).  "Even a defendant who contests his factual guilt at trial may, under

4    some circumstances, be entitled to such an adjustment." *United States v. Mohrbacher*, 182 F.3d

5    at 1052, citing *United States v. Ing*, 70 F.3d 553, 556 (9th Cir. 1995) (entrapment defense is not

6    inconsistent with downward adjustment for acceptance of responsibility)*, cert. denied,* 517 U.S.

7    1112 (1996); see also *United States v. Hernandez*, 894 F.3d 1104, 1111 (9th Cir. 2016).

8          In *United States v. Ing,* the Ninth Circuit stated, "The assertion of an entrapment defense

9    is not necessarily incompatible with acceptance of responsibility."  *United States v. Ing,* 70 F.2d

10   553, 556 (9th Cir. 1995), citing *United States v. Molina*, 934 F.2d 1440, 1451 (9th Cir. 1991).

11   The *Ing* opinion pointed out that "As the *Molina* court noted, the defense of entrapment by its

12   very nature entails an admission regarding the defendant's participation in criminal activity."

13   *United States v. Ing,* 70 F.2d at 556, citing *United States v. Molina*, 934 F.2d at 1450. "Where the

14   defendant presents such a defense, the sentencing judge must look at all the evidence bearing on

15   the defendant's contrition." *Id*.

16         The *Ing* court did also point out that not all who raised entrapment so benefit.  The court

17   explained that "Of course, a defendant whose only defense is entrapment is not automatically

18   entitled to an acceptance of responsibility adjustment. In *Molina*, we affirmed the district court's

19   decision to deny the defendant's request for this adjustment, because the defendant's testimony

20   conflicted with that of government agents "on almost every key incident."" *Id*., see *United States*

21   *v. Marquardt*, 949 F.2d 283, 285 (9th Cir. 1991) (denial of an acceptance of responsibility

22   adjustment where the defendant denied his intent to violate the law); *United States v. Burrows*,

23   36 F.3d 875, 883 (9th Cir. 1994) (defendant not entitled to adjustment where he maintained that

24   he lacked mens rea during and after trial); *United States v. Davis*, 36 F.3d 1424, 1435-36 (9th

25   Cir. 1994) (defendant not entitled to adjustment where there was no affirmative evidence of

26   contrition on the record), *cert. denied*, 115 S. Ct. 1147 (1995).

McKean  Sent. Mem.                          6

1          The court in *Ing* distinguished the holding in *Molina* and the other cases cited above by

2   pointing out that "Ing admitted his conduct and his intent throughout.  At sentencing, he plainly

3   acknowledged that what he did was wrong and expressed remorse for his actions." *Id*.

4          This case is analogous to the *Ing* case.  McKean's trial testimony is replete with

5   admissions by him that he agreed with the government about submitting an illegal bid.  He

6   repeatedly admitted during his trial testimony that he colluded by making an illegal bid:

7        Q.   Okay. I'd like you to explain to the jury what was in your mind when you heard:
             There's a bid that I have to submit, and this bid is supposed to be higher than the
8            bid that William Joseph submitted. What did that mean to you?

9        A.   That meant that -- that meant collusion.

10       Q.   And what did you understand "collusion" to be?

11       A.   When somebody puts in a bid that tries to make somebody else's bid look lower or
             an inaccurate representation of the work.
12
     TR: 1430.
13
         Q.   So you understood that what Derf was telling you sounded like collusion; correct?
14
         A.    Right.
15
         Q.   What did that make you think in terms of whether you wanted to get involved in
16            this project or not?

17       A.   From my state of mind, I was concerned about the def- -- the legality aspects of
             collusion are not good
18   .
     TR: 1431.
19
         A.   Correct. I believe it was -- the decision was going to be made that week.
20
         Q.   After he told you that, did you feel some kind of time
21            constraint?

22       A.   I felt a pinch, because I felt, again, this internal conflict of not wanting to do
             something illegal but also not wanting to miss an opportunity that this project
23            presented.

24   TR: 1439.

25

26

     McKean  Sent. Mem.                    7

1      Q.     Would you describe what you were going through in your mind in trying to decide whether you wanted to go ahead with submitting a bid or not?

2

      A.     The -- it was not a comfortable feeling because I knew on one -- at one hand, it was -- submitting a bid higher than somebody else's bid to validate their bid is illegal, not right.

3

4

             On the other hand, I saw William as potentially a godsend, at the time, that I needed.

5

TR: 1443.

6

      A.     On the flip side, there's the conflict of:  This is not a proper procedure.  This is illegal to come in above somebody else's number on a public job.

7

8

TR: 1445.

9      Q.     Did you know that when you submitted the bid?

10     A.     Did I know that --

11     Q.     Did you know that it was wrong and illegal?

12     A.     Collusion is illegal, and I knew what collusion was.

13

TR: 1455.

14     Nor did McKean deny his guilt when being cross-examined by the government counsel.

15     Instead, McKean admitted participating in a bid-rigging scheme:

16     Q.     Now, let's just get past a lot of this. You agree that this was a bid-rigging scheme; right?

17

      A.     Correct. And I hadn't heard the term "bid rigging" before this, but collusion is what I understood it to be, and it's the same thing.

18

19     Q.     And part of that is because in the state of California, if you're working on any public job, there's non-collusion rules; right?

20

      A.     Correct.

21

      Q.     Yeah. And the non-collusion rules are just basically common sense, that you shouldn't be submitting phony bids on jobs; right?

22

23     A.     Correct.

24     Q.     And so -- but I appreciate the distinction, that you understood it as collusion. Is that what you're telling us?

25

      A.     Yeah. I just hadn't heard the term of art as -- "bid rigging" wasn't something I'd heard before.

26

1

Q.      But you understand collusion is the same thing, and you're familiar with that concept?

2

A.      Correct.

3

Q.      And you were familiar with that concept when Derf Butler proposed a bid-rigging scheme to you in 2013?

4

5

A.      In, yeah, September -- early September 2013, correct.

6

TR: 1462.

7

Q.      So what did you take from that in terms of your illegal agreement?

8

A.      I never talked to Clifton about it; so I didn't know what his role was.

9

Q.      Right here, you see he submitted a bid. His got kicked out. You know these bids are all illegal; right?

10

Q.      Is that a "yes"? You're nodding your head, but is that a "yes"?

11

A.      Yes, these bids are improper, illegal.

12

TR: 1466.

13

A.      So the question was: The LBNL deal was a crooked deal? It was -- yes.

14

Q.      It was illegal?

15

A.      Illegal.

16

TR: 1472.

17

In addition to his trial testimony, McKean proffered twice with the government, again

18

making significant admissions.  PSR 39.  At trial, he testified that he admitted to the government

19

in those proffer sessions that he submitted the bid.  TR: 1452-54.

20

Finally, in his statement to the Probation Officer in his pre-sentence interview, McKean

21

admitted making a bid "to ensure that Joseph's bid would be the lowest and as a result, he would

22

be awarded the project..."  PSR ¶ 43.

23

In sum, McKean has repeatedly admitted, before, during, and after trial, that he submitted

24

an artificial bid, for a job he had no expectation of being awarded, in order to ensure that a third

25

person submitted the winning bid.  He went to trial to interpose a legal defense, that he was

26

entrapped at a time when his company was experiencing financial difficulty.  And, he went to trial after being unable to accept joint offers of settlement.  In this case, the Court should award a 2 level adjustment for Acceptance of Responsibility, which would result in a final offense level of 10, criminal history I, with an advisory sentencing range of 6-12 months.

**3.     The Defendant's Request for Ten Months Home Detention**

Mr. McKean asks the Court to grant the probation department's proposed variance, but convert the 5 months incarceration followed by 5 months home detention to time served, with 3 years supervised release, with a condition that he serve 10 months home detention, so that the defendant can maintain his employment and stay safe from COVID-19.

As the guidelines are advisory, the defendant's recommended sentence is available to the Court even if the Court does not award 2 points for acceptance of responsibility and keeps the final offense level at 12.  If the Court disagrees with the defendant's contention that he should be granted a 2 point reduction for acceptance of responsibility, then the defendant suggests that the Court can alternatively view the perhaps imperfect entrapment defense offered by the defendant at trial as a factor that justifies a downward variance to a 10 month home confinement sentence. See U.S.S.G. § 5K2.12.

**a.     The Impact of the COVID 19 Pandemic Favors a Non-Jail Sentence**

The defendant appreciates the recommended variant sentence set forth by the probation officer.  Six months ago, there might be little to argue about.  The Court would have carefully balanced the various factors, such as deterrence versus aberrant behavior, punishment versus remorse; and perhaps agreed with probation and required 5 months incarceration.

Now Covid-19 is like a 100 pound weight thrown on the balancing scale.  Strong indeed should be the counterweight before the scale tips back towards a period of incarceration. Sentencing anyone to prison now comes with the increased risk that a defendant, even if otherwise healthy, may become sick, or very sick, or die.  The BOP website discloses that as of July 23, 2020, 9,936 federal inmates have tested positive at one point for COVID 19;  4,247

1   federal inmates and 385 BOP staff have currently tested positive for COVID 19, and there have

2   been 98 federal inmate deaths attributed to COVID-19.  https://www.bop.gov/coronavirus/ (July

3   23, 2020).

4          The Federal Government itself has recognized the risks posed by the COVID-19

5   pandemic.  In his memorandum of March 26, 2020, Attorney General Barr urged home

6   confinement for some inmates at federal prisons.  Even though these prisoners had been

7   convicted of federal crimes, Attorney General Barr recognized that the COVID-19 pandemic

8   necessitated a reconsideration of who should remain incarcerated during this crisis.  Since the

9   release of the Attorney General's original memo to the Bureau of Prisons on March 26, 2020, the

10  BOP has placed an additional 7,042 inmates on home confinement.

11  https://www.bop.gov/coronavirus/ (July 23, 2020).

12         The government may argue that McKean can be placed at a BOP facility where there are

13  few or no cases of COVID-19.  But, the recent experience at the California prison at San

14  Quentin, illustrates how quickly things can change.   The Los Angeles Times reported on June

15  30, 2020, that: "Unlike other prisons in California, San Quentin had escaped any coronavirus

16  outbreak until early June. But 121 inmates were moved there from the Chino prison on May 30.

17  Inmates in Chino who did not test positive and are medically vulnerable were transferred to other

18  prisons, including San Quentin and Corcoran. The transfers ignited outbreaks at both prisons,

19  with a federal judge calling the moves a significant failure."  2020https://www.latimes.com/

20  california/story/2020-06-30/.  As of July 13, 2020, the outbreak had mushroomed to 1899

21  confirmed cases of COVID-19 with 694 reported in the last two weeks, and 9 deaths.

22  https://www.sfchronicle.com/bayarea/article/Two-more-San-Quentin-prisoners-die-from-COVID

23  -19-15403309.php (July 13, 2020).

24         Just today, in checking for updated BOP COVID-19 statistics, counsel noted online news

25  reports of a new COVID-19 outbreak at the Forth Worth Federal Medical Center, stating that the

26  "number of confirmed cases at the Federal Medical Center-Carswell in Fort Worth jumped to

1    510 on Tuesday, just two days after the Bureau of Prisons reported that 200 women there had

2    tested positive for COVID-19, the illness caused by the coronavirus. Only the federal prison in

3    Seagoville, also located in the Dallas-Fort Worth area, had more infected inmates, with 1,156

4    cases as of Tuesday."   https://www.nbcdfw.com/news/coronavirus/ covid-19-outbreak

5    -reported-at-fort-worth-federal-medical-prison/2410816/ (July 21, 2020).

6            The explosive growth in cases in prison and jail is easily understood.  Dr. Brie Williams,

7    Professor of Medicine at the University of California, San Francisco ("UCSF") in the Geriatrics

8    Division,  Director of UCSF's Amend: Changing Correctional Culture Program, and Director of

9    UCSF's Criminal Justice & Health Program, has stated in her attached declaration that "Because

10   inmates live in close quarters, there is an extraordinarily high risk of accelerated transmission of

11   COVID-19 within jails and prisons."  See Exhibit A, Declaration, page 3.  Dr. Williams opines

12   that "Inmates share small cells, eat together and use the same bathrooms and sinks. They eat

13   together at small tables that are cleaned only irregularly. Some are not given tissues or sufficient

14   hygiene supplies.  Effective social distancing in most facilities is virtually impossible, and

15   crowding problems are often compounded by inadequate sanitation, such as a lack of hand

16   sanitizer or sufficient opportunities to wash hands."  Exh. A at page 3.

17           It is true that Mr. McKean is not over 65 years old, and is in relatively good health.  PSR

18   ¶ 68.  But, that does not guarantee that he would not become sick or suffer serious complications.

19   Table 3 of the CDC Coronavirus Disease 2019 Case Surveillance — United States, January

20   22–May 30, 2020, indicates that as of May 30, 2020, that of the 235,774 patients between the

21   ages of 50-59, out of 235,774 who contracted the virus, 5,639 have died.

22   https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm#T3_down

23           Because of the risk all inmates, no matter their age or physical condition, now face if

24   imprisoned, the defendant asks the court to consider a non-jail sentence.

25

26

McKean  Sent. Mem.                         12

**b.      The Relevant 18 U.S.C. § 3553(a) Factors Also Favor a Non-Jail Sentence**

**i.      The nature and circumstances of the offense.**

This Court is aware of all the nature and circumstances of these offenses, which involve a sting operation. Certainly real corruption in public dealings is a major problem, but there are also unique mitigating circumstances in this sting operation relating to the nature and circumstances of these offenses. Counsel is unaware that the defendant had any prior criminal actions before he agreed to submit a false bid here. The sting has resulted in the prosecution of a defendant who was trying to keep his company financially healthy, which should justify some mercy.

**ii.     The history and characteristics of the defendant.**

The defendant submits that this factor strongly supports his sentencing recommendation.

The probation officer suggests that "The Court may wish to consider the defendant's family and business responsibilities, his community involvement, his military service, and the adverse impact the conviction in the instant offense has had on his business in support of a custodial sentence below the advisory guideline range, pursuant to 18 U.S.C. § 3553(a) - history and characteristics of the defendant and nature and circumstances of the offense." PSR 101.

The probation officer's statement is well taken. Well before this case arose, Mr. McKean was helping his community. The defendant has served in the U.S. Navy. PSR ¶ 72. In 1990, he received a Humanitarian Service Medal from the Navy for his work during the Loma Preita Earthquake. See Exhibit B. He has volunteered at the Peninsula Humane Society, and he has been a volunteer English tutor for the San Mateo Adult School, as verified by the probation officer. PSR ¶ 66, See Exhibit C..

The attached letters from the defendant's support group give testament to the defendant's character. See Exhibit D. Counsel will not repeat all the statements here, but rather will point out that Mr. McKean has a long history, before and after these troubles arose, of helping others, of dealing with issues with his daughter, and with comforting those in trouble.

McKean  Sent. Mem.                          13

1    Mr. McKean points out to counsel that if allowed to serve his time in home detention, he

2  can continue, via ZOOM conferencing, with his volunteer work at the San Mateo Adult School,

3  and continue to help the community.

4    Moreover, before this case, Mr. McKean had no prior criminal history.  Not only does he

5  not have any other convictions, he was never even arrested.

6    Mr. McKean has the strong support of his family, particularly his wife and daughters.

7  Although this conviction has and will continue to affect his licencing, he does have work

8  available to him, in lower capacities, and can continue to support his family if allowed to work

9  during home confinement.

10  **iii.    The need for the sentence to reflect the seriousness of the offense, promote respect
11           for the law, provide just punishment, afford adequate deterrence, and protect the
           public.**

12    The defendant acknowledges that his offense is a serious matter, and is certainly aware of

13  the consequences of his actions.  Both Mr. McKean and his family were greatly frightened when

14  they learned how serious this violation was in federal court.

15    The sentence sought by the defendant would provide adequate punishment in this case

16  and protect the public.  This case also presents very low chance of new criminal conduct, so any

17  concern about deterrence should be low.

18    The defendant is asking that the Court sentence him to custody time, but structure the

19  time as home confinement so that he can maintain his employment and avoid the risk posed by

20  COVID 19.  This will punish Mr. McKean, but also allow him to continue his successful

21  rehabilitation.

22  **iv.    Need to Avoid Disparity.**

23    The defendant notes that the Court has before it a number of co-defendants for

24  sentencing, so that any disparity argument at this point appears premature.

25

26

McKean  Sent. Mem.                       14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CONCLUSION**

The defendant asks this Court to sentence him to time served, followed by three years of supervised release, with a condition that he serve 10 months in home detention with electronic monitoring, a $200 special assessment, and a $3000 fine.

DATED: July 23, 2020.                    Respectfully submitted,


                                         */s/ John J. Jordan*
                                         JOHN J. JORDAN
                                         Attorney for Peter McKean